**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TERESA DELARUE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TRC COMPANIES, INC., CHRISTOPHER P. VINCZE, RICHARD H. GROGAN, JOHN A. CARRIG, F. THOMAS CASEY, STEPHEN M. DUFF, STEPHANIE C. HILDEBRANDT, KATHLEEN M. SHANAHAN, KEITH TRENT, DENNIS E. WELCH, NEW MOUNTAIN CAPITAL, L.L.C., NEW MOUNTAIN PARTNERS IV, L.P., BOLT INFRASTRUCTURE PARENT, INC., and BOLT INFRASTRUCTURE MERGER SUB, INC.,<br><br>Defendants. | Case No. _____<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by her undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on March 31, 2017 (the "Proposed Transaction"), pursuant to which TRC Companies, Inc. ("TRC" or the "Company") will be acquired by affiliates of New Mountain Partners IV, L.P. and New Mountain Capital, L.L.C.

2. On March 30, 2017, TRC's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger

Agreement") with Bolt Infrastructure Parent, Inc. ("Parent") and Bolt Infrastructure Merger Sub, Inc., ("Merger Sub," and together with Parent, New Mountain Partners IV, L.P., and New Mountain Capital, L.L.C., "New Mountain"). Pursuant to the terms of the Merger Agreement, shareholders of TRC will receive $17.55 in cash for each share of TRC common stock.

3. On May 8, 2017, defendants filed a proxy statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4. The Proxy Statement, which scheduled a stockholder vote on the Proposed Transaction for June 8, 2017, omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of TRC common stock.

9.     Defendant TRC is a Delaware corporation and maintains its principal executive offices at 21 Griffin Road North, Windsor, Connecticut 06095. TRC's common stock is traded on the NYSE under the ticker symbol "TRR."

10.    Defendant Christopher P. Vincze ("Vincze") is a director, Chairman of the Board, and Chief Executive Officer ("CEO") of TRC.

11.    Defendant Richard H. Grogan ("Grogan") is the Lead Director of TRC. According to the Company's website, Grogan is Chair of the Nominating and Corporate Governance Committee and a member of the Compensation Committee.

12.    Defendant John A. Carrig ("Carrig") is a director of TRC. According to the Company's website, Carrig is a member of the Audit Committee.

13.    Defendant F. Thomas Casey ("Casey") is a director of TRC. According to the Company's website, Casey is Chair of the Audit Committee.

14.    Defendant Stephen M. Duff ("Duff") is a director of TRC. According to the Company's website, Duff is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

15.    Defendant Stephanie C. Hildebrandt ("Hildebrandt") is a director of TRC. According to the Company's website, Hildebrandt is a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

16.    Defendant Kathleen M. Shanahan ("Shanahan") is a director of TRC.

17.    Defendant Keith Trent ("Trent") is a director of TRC.

18. Defendant Dennis E. Welch ("Welch") is a director of TRC. According to the Company's website, Welch is Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

19. The defendants identified in paragraphs 10 through 18 are collectively referred to herein as the "Individual Defendants."

20. Defendant New Mountain Capital, L.L.C. is a growth-oriented investment firm headquartered in New York.

21. Defendant New Mountain Partners IV, L.P. is an investment fund managed by New Mountain Capital, L.L.C.

22. Defendant Parent is a Delaware corporation, an affiliate of New Mountain Partners IV, L.P., and a party to the Merger Agreement.

23. Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, an affiliate of New Mountain Partners IV, L.P., and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

24. Plaintiff brings this action as a class action on behalf of herself and the other public stockholders of TRC (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

25. This action is properly maintainable as a class action.

26. The Class is so numerous that joinder of all members is impracticable. As of March 28, 2017, there were approximately 31,620,014 shares of TRC common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

27. Questions of law and fact are common to the Class, including, among others,

whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

28. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

29. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

30. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

31. TRC is a national engineering, environmental consulting, and construction management firm that provides integrated services to the energy, environmental, and infrastructure markets.

32. The Company serves a broad range of clients in government and industry, implementing complex projects from initial concept to operations.

33. TRC has over 4,100 technical professionals and support personnel at more than 120 offices throughout the United States.

34. On November 23, 2016, TRC issued a press release wherein it announced its financial results for the fiscal first quarter ended September 30, 2016. The Company reported that net service revenue increased from $100.2 million to $124.3 million compared to the three months ended September 25, 2015. Additionally, EBITDA increased from $9.9 million to $10.5 million. With respect to the financial results, Individual Defendant Vincze commented:

> In the first quarter of fiscal 2017, NSR was $124 million, up 24% from $100 million in the same period of fiscal 2016. The increase was primarily driven by our Oil & Gas segment, which we acquired during the second quarter of fiscal 2016, as well as by large projects in our Power and Infrastructure segments[.] EBITDA increased to $10.5 million, up $0.5 million, or 5% from the prior-year period.

Vincze continued:

> In our Power segment, NSR increased 8% and segment profit rose 9%, compared with the first quarter of fiscal 2016. . . . Our Oil & Gas segment generated much improved results, despite continued uncertainty in this market. NSR of $21.3 million increased from $20.8 million in the fourth quarter of fiscal 2016. Segment profit was $1.4 million, up from a segment loss in the fourth quarter[.]

Vincze concluded:

> We are encouraged by the long-term prospects in each of our segments[.] In our Power segment, demand from our utility clients, our current expansion in California and the ongoing shift toward program management work are driving revenue growth. We are working on significant state and public-private partnership projects that should fuel Infrastructure results in the near term. The capital spend slowdown in oil and gas continues to weigh on our Environmental segment. However, this should be partially offset by demand for services related to construction, transaction support, the retirement of coal plants and renewable energy. Our Oil & Gas segment appears to be stabilizing, and we expect to see a number of capital projects going forward. In particular, we see an increased level of activity and interest in our pipeline integrity-related services.

35. On February 2, 2017, TRC issued a press release wherein it announced its financial results for the fiscal second quarter ended December 30, 2016. The Company reported

6

that net service revenue increased from $111.4 million to $127.4 million compared to the three months ended December 25, 2015. EBITDA increased from $9.5 million to $11.4 million, and net income increased from $3.9 million to $4.0 million. With respect to the financial results, Individual Defendant Vincze commented:

> Our second quarter results demonstrate the benefit of our diversified business model, which has driven continued growth during the past several quarters. In the second quarter of fiscal 2017, robust demand drove growth in revenues and generated strong operating cash flow. NSR was $127.4 million, up 14% from $111.4 million in the same period of fiscal 2016. The increase was primarily from our Oil & Gas segment, which we acquired late in the second quarter of fiscal 2016, as well as the strong performance of our Infrastructure segment[.] Operating income was $7.0 million, up $0.3 million from the prior-year period. Net income was $4.0 million, up $0.1 million from the year-ago period, and EBITDA was $11.4 million, up $1.9 million or 20% from the prior-year period. Our $26.7 million cash balance at the end of the quarter was up significantly as a result of operating cash flow of $21.4 million.

Vincze concluded:

> The long-term prospects are favorable and improving in each of our four segments, driven by strong underlying fundamentals[.] In our Power segment, demand from our utility clients, our expansion in California and the shift toward program management work continue to build backlog. Significant state and public-private partnership projects should fuel Infrastructure results in the near term, with any additional expenditures at the federal level under the new Administration providing further mid- and long-term opportunity. The capital spend slowdown in oil and gas has stabilized, but a lack of investment in large projects continues to weigh on our Environmental segment. However, we expect this to be partially offset by increased demand for services related to industrial and construction activity, transaction support, and the ongoing retirement of coal plants and expansion of renewable energy. Our Oil & Gas segment has achieved consistent financial performance during the past six months. We expect to see a continuation of this trend in the second half of our fiscal year, led by demand for our pipeline integrity-related services.
>
> With the integration of the Oil and Gas acquisition now complete, we are again exploring strategic acquisitions that provide opportunities to expand geographically and enhance our technical capabilities[.] We recently acquired the New Brunswick, N.J. office of Applied Energy Group, the administrator of New Jersey's Clean Energy Program. This acquisition supports TRC's strategy of enhancing our leadership position in the energy efficiency services market, in order to prepare for evolving energy policies and economic drivers.

36. Nevertheless, the Board caused the Company to enter into the Merger Agreement, pursuant to which TRC will be acquired for inadequate consideration.

37. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 5.2(a) of the Merger Agreement states:

> (a) The Company shall not, and shall not permit or authorize any of the Company Subsidiaries or its or their respective Representatives, directly or indirectly, to (i) solicit, facilitate or initiate or knowingly encourage or induce any inquiry, proposal or offer with respect to, or the making or completion of, any Competing Proposal, or any inquiry, proposal or offer that is reasonably likely to lead to any Competing Proposal, (ii) enter into, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any Person any information or data with respect to, or otherwise cooperate in any way with, any Competing Proposal, (iii) approve, endorse or recommend any proposal that constitutes or is reasonably likely to lead to any Competing Proposal, (iv) other than an Acceptable Confidentiality Agreement, enter into any merger agreement, letter of intent, term sheet, agreement in principle, memorandum of understanding, acquisition agreement or other similar agreement providing for, facilitating or endorsing a Competing Proposal or enter into any contract, agreement or arrangement requiring the Company to abandon, terminate or fail to consummate the Transactions, or (v) furnish to any Person (other than Parent, its affiliates or any of their Representatives, the Company's affiliates or the Representatives of the Company or any of the Company's affiliates) any information relating to the Company or any Company Subsidiary or to afford to any Person access to the business, properties, assets, books, records of other information, or to any personnel, of the Company and Company Subsidiaries (other than Parent, its affiliates or any of their Representatives, the Company's affiliates or the Representatives of the Company or any of the Company's affiliates). The Company shall, and shall cause each of the Company Subsidiaries to, and use its reasonable best efforts to cause its and their Representatives to (A) immediately cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Competing Proposal, (B) request the prompt return or destruction of all non-public information previously furnished in connection therewith and cease to provide any further information

with respect to the Company, any Company Subsidiary or any Competing Proposal to such Person, (C) terminate "data room" access for any Person (other than Parent and its affiliates) and (D) not terminate, waive, amend, release or modify any provision of any confidentiality or standstill agreement to which it or any of its affiliates or Representatives is a party with respect to any Competing Proposal, and enforce the provisions of any such agreement.

38. Further, the Company must promptly advise New Mountain of any proposals or inquiries received from other parties. Section 5.2(d) of the Merger Agreement states:

(d) The Company shall as promptly as reasonably practicable (and in any event within forty-eight (48) hours) following the receipt of any written Competing Proposal, provide Parent with the material terms of any such Competing Proposal (including, if applicable, copies of any written requests, proposals or offers, including proposed agreements) and the identity of the Person or group of Persons making such Competing Proposal; provided, however, that the Company shall not be required to disclose the identity of the Person making such Competing Proposal if such disclosure is prohibited by the terms of a confidentiality agreement with such Person. The Company shall keep Parent reasonably informed on a reasonably prompt basis (and in any event within forty-eight (48) hours of any material development) of the status and details (including amendments) of any such Competing Proposal and provide Parent with any documents describing or evidencing any such Competing Proposal.

39. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants New Mountain a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.2(e) of the Merger Agreement provides:

(e) Notwithstanding the limitations set forth in Section 5.2(a) and Section 5.2(b), at any time prior to obtaining the Requisite Stockholder Approval, the Company Board of Directors may, if the Company Board of Directors determines in good faith (after consultation with outside counsel) that the failure to do so would be inconsistent with the proper exercise of its fiduciary duties to the stockholders of the Company under applicable Law, cause the Company to terminate this Agreement pursuant to Section 8.1(h) (including payment of the applicable Company Termination Fee) and concurrently enter into a definitive agreement with respect to a Superior Proposal; provided, however, that the Company Board of Directors may not terminate this Agreement pursuant to this Section 5.2(e) unless:

(i) the Company shall have provided prior written notice to Parent, at least seventy-two (72) hours in advance (the "Notice Period"), of its intention to terminate this Agreement to enter into a definitive agreement with respect to such Superior Proposal, which notice shall specify the material terms and conditions of any such Superior Proposal (including the identity of the Person making such Superior Proposal and substantially complete copies of all forms of agreements with respect to such Superior Proposal);

(ii) prior to terminating this Agreement to enter into a definitive agreement with respect to such Superior Proposal, the Company shall, and shall cause its Representatives to, during the Notice Period, negotiate with Parent and its affiliates in good faith (to the extent Parent and its affiliates also have notified the Company that they so seek to negotiate) to make such adjustments in the terms and conditions of this Agreement, the Equity Commitment Letter and the Guarantee, as applicable, so that the Competing Proposal would cease to constitute a Superior Proposal; and

(iii) taking into account all adjustments to the terms of this Agreement that may be offered in writing by Parent pursuant to this Section 5.2(e) as described above, the Company Board of Directors determines in good faith after consultation with the Company's outside legal and financial advisors that such Competing Proposal still constitutes a Superior Proposal (it being understood and agreed that any change to the financial or other material terms of a Competing Proposal that was previously the subject of a notice hereunder shall require a new notice to Parent as provided above, but with respect to any such subsequent notices, references herein to a "seventy-two (72) hours" shall be deemed references to "forty-eight (48) hours").

40. Further locking up control of the Company in favor of New Mountain, the Merger Agreement provides for a "termination fee" of $19,380,000, payable by the Company to New Mountain if the Individual Defendants cause the Company to terminate the Merger Agreement.

41. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

42. Additionally, Parent and Merger Sub entered into a voting and support agreement with The Clark Estates, Inc., pursuant to which it has agreed to vote its Company shares in favor

of the Proposed Transaction. Accordingly, approximately 17.6% of the Company's shares are already locked up in favor of the merger.

43. The consideration to be provided to plaintiff and the Class in the Proposed Transaction is inadequate.

44. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

45. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

46. Meanwhile, certain of the Company's officers and directors stand to receive significant benefits as a result of the Proposed Transaction.

47. For example, the Company's management team will retain their employment positions following the close of the merger. The press release announcing the Proposed Transaction states: "New Mountain plans to operate TRC as a standalone business operation with the current management team remaining in place."

48. Additionally, Individual Defendant Vincze will receive a transaction bonus of $5 million in connection with the Proposed Transaction.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

49. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

50. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

51. First, the Proxy Statement omits material information regarding TRC's financial projections and the financial analyses performed by the Company's financial advisor, Houlihan Lokey Capital, Inc. ("Houlihan"), in support of its so-called fairness opinion.

52. With respect to TRC's financial projections, the Proxy Statement fails to disclose, *inter alia*: (i) unlevered free cash flows and the constituent line items; (ii) capital expenditures; (iii) changes in net working capital; (iv) taxes; (v) interest expense; and (vi) net operating losses.

53. With respect to Houlihan's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the unlevered free cash flows used by Houlihan in the analysis; (ii) the corresponding definition of unlevered free cash flow and constituent line items; and (iii) the inputs underlying the discount rates ranging from 12.0% to 13.0%.

54. The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

55. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Board"; (iii) "Opinion of Houlihan Lokey"; and (iv) "Selected Company Projections."

56. Second, the Proxy Statement omits material information regarding potential conflicts of interest of the Company's officers and directors.

57. Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of TRC's officers and directors, including who participated in all such communications, including the discussions described by Individual Defendant Vincze at the March 30, 2017 Board meeting.

58. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

59. The Proxy Statement further fails to disclose the timing and nature of all communications regarding TRC's officers' right to purchase or participate in the equity of the surviving corporation, including who participated in all such communications.

60. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Board"; and (iii) "Interests of Our Directors and Executive Officers in the Merger."

61. Third, the Proxy Statement fails to disclose the terms of the non-disclosure and standstill agreements executed by TRC and the prospective bidders, including whether any agreements contained "don't ask, don't waive" provisions that restrict the prospective bidders' abilities to request a waiver of standstill provisions, and how many agreements did not contain "an exception [to standstill provisions] to the extent necessary to allow such person to make a confidential proposal to the Company or to the Board."

62. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; and (ii) "Reasons for the Merger; Recommendation of the Board."

63. Fourth, the Proxy Statement omits material information regarding potential conflicts of interest of Houlihan.

64. For example, the Proxy Statement fails to disclose the nature of the "certain financial advisory services [provided] to one or more members of the NMC [New Mountain Capital, L.L.C.] Group."

65. The Proxy Statement fails to disclose whether Houlihan has provided services to TRC or its affiliates in the past two years, as well as the amount of compensation received for such services.

66. Additionally, the Proxy Statement states:

> Houlihan Lokey and certain of its affiliates and certain of its and their respective employees may have committed to invest in private equity or other investment funds managed or advised by NMC, other participants in the Merger or certain of their respective affiliates or security holders, and in portfolio companies of such funds, and may have co-invested with members of the NMC Group, other participants in the Merger or certain of their respective affiliates or security holders, and may do so in the future. Furthermore, in connection with bankruptcies, restructurings, and similar matters, Houlihan Lokey and certain of its affiliates may have in the past acted, may currently be acting and may in the future act as financial advisor to debtors, creditors, equity holders, trustees, agents and other interested parties (including, without limitation, formal and informal committees or groups of creditors) that may have included or represented and may include or represent, directly or indirectly, or may be or have been adverse to, us, Parent, members of the NMC Group, other participants in the Merger or certain of their respective affiliates or security holders, for which advice and services Houlihan Lokey and its affiliates have received and may receive compensation.

However, the Proxy Statement fails to disclose the nature of such commitments, co-investments, and financial advisory services, and the amount of compensation received by Houlihan for such services.

14

67. Furthermore, the Proxy Statement fails to disclose Houlihan's holdings in New Mountain's and its affiliates' stock.

68. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

69. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger; Recommendation of the Board"; and (iii) "Opinion of Houlihan Lokey."

70. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to TRC's stockholders.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and TRC

71. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

72. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. TRC is liable as the issuer of these statements.

73. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

74. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

75. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

76. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

77. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

78. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and New Mountain

79. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

80. The Individual Defendants and New Mountain acted as controlling persons of TRC within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of TRC and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

81. Each of the Individual Defendants and New Mountain was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

82. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

83. New Mountain also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

84. By virtue of the foregoing, the Individual Defendants and New Mountain violated Section 20(a) of the 1934 Act.

85. As set forth above, the Individual Defendants and New Mountain had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: May 18, 2017               **LEVI & KORSINSKY LLP**

                        By:  */s/ Shannon L. Hopkins*
**OF COUNSEL:**              Shannon L. Hopkins
                             733 Summer Street, Suite 304
**RIGRODSKY & LONG, P.A.**   Stamford, CT 06901
Brian D. Long                (203) 992-4523
Gina M. Serra
2 Righter Parkway, Suite 120   *Attorneys for Plaintiff*
Wilmington, DE 19803
(302) 295-5310

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Teresa Delarue ("Plaintiff"), hereby declare as to the following claims asserted under the federal securities laws that:

1. Plaintiff has reviewed the complaint and authorizes its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or to participate in this action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition or trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in TRC Companies, Inc. (NYSE: TRR) securities that are the subject of this action:

| No. of Shares | Stock Symbol | Buy/Sell | Transaction Date | Price Per Share |
|---|---|---|---|---|
| 250 | TRR | BUY | 4/20/12 | $6.68 |
| 200 | TRR | SELL | 5/1/12 | $6.43 |
|  |  |  |  |  |
|  |  |  |  |  |

*Please list additional transactions on separate sheet of paper, if necessary.*

5. Plaintiff will actively monitor and vigorously pursue this action for the Class' benefit.

6. Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification: _____.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of the Class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as the Court orders or approves.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this _17_ day of _MAY_, 2017.

_____
Signature

_TERESA DELARUE_
Print Name

2